IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Robyn Michelle Wilkins, | ) | C/A No.: 3:06-334-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | OPINION AND ORDER |
| | ) | |
| State Farm Mutual Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on Defendant's motion for summary judgment. For the reasons set forth below, this motion is granted in full.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate

"specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

**FACTS**

Taken in the light most favorable to Plaintiff, the facts are as follows. Plaintiff, Robyn Michelle Wilkins ("Wilkins" or "Ms. Wilkins"), was injured in an automobile accident on January 15, 2003. Wilkins was, at the time, a back seat passenger in a car driven by her husband. The driver of the other vehicle, Antonio Sequra ("Sequra") was both at fault and uninsured.

Wilkins and her husband placed their insurer, State Farm Mutual Automobile Insurance Company ("State Farm"), on notice of the accident, including the fact that Ms. Wilkins had been injured. Dkt. No. 99-2 at 32. For several months, Ms. Wilkins dealt directly with State Farm, keeping it informed of her ongoing treatment. Dkt. No. 99-2 at 26-27. On February 15, 2003, she provided State Farm with a release for medical records. Dkt. No. 99-2 at 8. At this point, Wilkins was receiving treatment though military sources. Wilkins and State Farm representatives discussed the probability that the military would assert a lien. Both Wilkins and State Farm made efforts to obtain the necessary records and information regarding the lien process but these efforts were delayed due to military priorities. Dkt. No. 99-2 at 26-27.

On June 2, 2003, Wilkins informed State Farm that she was scheduled for surgery to correct two herniated discs. She spoke with a State Farm representative again on July 2, 2003, to report that

she had had the surgery but was not doing any better. Dkt. No. 99-2 at 24. There is no evidence of any demand or of any problems relating to claim processing during this period.[1]

The next contact with State Farm was a letter from counsel who wrote to State Farm on July 10, 2003, to advise of his representation. Counsel stated that it was "too early to assess Plaintiff's damages" but asked for information regarding the available underinsured and uninsured motorist coverage. Dkt. No. 95-6. Counsel later requested a certified copy of the policy. Dkt No. 99-2 at 24. There is no indication these requests were not promptly satisfied.

Counsel again wrote to State Farm on January 14, 2004. Dkt. No. 99-2 at 6. In this letter he offered "basic information" on the claim, including that Wilkins had "required a three level cervical fusion following the accident." He also suggested long term difficulties as follows: "This will also require her to retire from the military due to her disability. She was recently released by the doctor and every indication is that this is a policy limits case. It is also quite likely this will end up being an uninsured motorist claim." The letter concluded by stating that counsel "trust[ed] this information will be helpful in setting [State Farm's] reserves." No demand was made at this time and there is

---

[1] Early medical reports indicated that Wilkins was experiencing significant pain but that her medical providers believed the pain might resolve with conservative treatment. *E.g.* Dkt. No. 95-10 (April 23, 2003 report of Jose A. Santiago, M.D.). These reports also indicated that the accident likely triggered the pain symptoms but that the underlying cause was the result of relatively minor degenerative changes in the cervical spine. *Id.* at 3. They also indicated that Wilkins was, at that time, an active duty senior airman with five years of service who was still working but with some limitations including a prohibition on heavy lifting. The social history in this report indicated that Wilkins "was scheduled to separate [from the service] this summer" *but had not been allowed to do so* "due to the current on going war." *Id.* at 2.

Unfortunately Wilkins pain continued, leading to surgery in early June 2003. *See* Dkt. No. 95-8 & 95-9 (medical records of surgery). Wilkins remained out of work for six weeks following surgery. *Id.* Her six week follow-up report indicates that she was "continuing to do well" although she still had some aching which the doctor expected might take a few months to resolve. Her x-rays showed "excellent fusion and good [range of motion.]" Dkt. No. 95-9. Wilkins was released to work with no restrictions but with prescriptions covering a two month period. *Id.*

no indication that any support was provided for the factual assertions in the letter.

Six months later, on June 14, 2004, counsel again wrote to State Farm. This letter, which included the first demand for payment, stated that it enclosed Wilkins' "complete medical records and bills." It provided a summary of the accident as well as Wilkins' injuries and treatment. The treatment summary began with Wilkins' trip to the emergency room on the date of the accident, and referred to follow up care on January 21 and 31, 2003, and physical therapy continuing into March 2003. The letter advised that Wilkins was referred to a neurosurgeon, Dr. Santiago, in May 2003, and that Dr. Santiago performed a cervical diskectomy with fusion and plating of C5-6 and C6-7 in June 2003, and released Wilkins from his care on July 21, 2003.[2] No other dates of treatment were mentioned although a few military treatment records running through Wilkins's November 2003 separation physical were also apparently attached to this letter. An undated list of medical expenses was also provided with a stated total of $47,178.36.[3]

The June 14, 2004 letter also asserted that Wilkins had left the service because she was "no longer able to perform her duty requirements" and was "currently treating with the Veterans Administration." The letter did not, however, state that Plaintiff had been given a disability rating by the military or any physician, much less that any disability was connected to the accident. Neither

---

[2] The attached medical records indicate Dr. Santiago first examined Plaintiff in April 2003, rather than in May. This error is, however, of no particular significance.

[3] The record contains military medical records for treatment on the following dates: July 25, 2003, August 22, 2003, October 21, 2003, and November 12, 2003. Dkt. 99-2 at 16-20. These documents appear to have been attachments to the June 14, 2004 letter, although they were presumably not the only attachments. Defendant has submitted other medical records relating to Plaintiff's treatment by Dr. Santiago from April through July of 2003. Dkt. No. 95-8 to 95-10. These records were also apparently attachments to the June 14, 2004 letter. There are no records of any medical treatment after November 2003.

4

did the letter offer any calculation of past lost wages or anticipated future losses. Most critically, the letter contained no documentation of any disability.

Counsel concluded by asking State Farm to tender its policy limits which counsel understood to be $50,000. Dkt. No. 95-7 at 3.[4] This request was followed by the statement that it was "unquestionable that [Wilkin's] damages will well exceed $50,000.00." *Id.* at 3. Counsel asked for a response within fifteen days and added: "If I have not heard from you or the limits are not tendered, I will [file] suit pursuant to *Nichols v. State Farm Mut. Ins. Co.,* 306 S.E.2d 616 (S.C. 1983).

State Farm responded by letter dated June 21, 2004, through its claim representative, Brent McKinney ("McKinney"). This letter promised to contact counsel upon review and evaluation of the information provided. It concluded: "If you have any questions or if I can be of assistance, please call me." Dkt. No. 99-2 at 5.

McKinney completed a Claim Analysis Report on or about July 1, 2004. This report acknowledged that Plaintiff reported immediate neck pain after the accident. It listed the medical records and related dates of treatment, and reflected verified special damages of $45,326.99.[5] The latest date listed for a medical bill is in June 2003. Dkt. No. 99-2 at 11.[6] This report acknowledged that initial treatment was conservative but that a cervical diskectomy was performed on June 6, 2003.

---

[4] The Wilkinses were insured under two policies on the date of the accident. Each of those policies provided for $50,000 in uninsured motorist ("UM") coverage. Because this coverage may be "stacked," the total UM coverage available for Ms. Wilkins' injuries is $100,000.

[5] This figure is slightly lower than the total claimed by Wilkins' attorney in his June 14, 2004 letter. The difference is, presumably, due either to the absence of supporting documentation for one or more of the claimed expenses or to mathematical error by one or the other. The reason for the difference is, however, of no significance to the rulings in this order.

[6] The subsequent treatment or examinations by the military (through November 2003) apparently did not result in bills.

It noted, however, that "[t]he spondylotic changes were there prior to the accident, but the symptomology was triggered by the MVA." After the heading "Weaknesses," McKinney wrote: "Liability; damage; surgery; doctors will relate surgery to treatment of this loss." Nothing is listed after the heading "Strengths." Under evaluation range, McKinney noted: "We have two policies each with U 50/100.

Dkt. No. 99-2 at 12.[7]

There was no record of any further activity or communication until November 9, 2004, when McKinney prepared an internal report. In this report, McKinney acknowledged that it was "a case of clear liability on the part of the adverse driver who was uninsured at the time." He repeated his prior medical summary including that Wilkins had preexisting spondylotic changes which were minimal but that "her symptomatology was most likely triggered by this accident." He noted the surgery and that Wilkins was released by her surgeon in July 2003 after two follow up visits. *Id.* Under the heading "Modifiers," he noted the "obvious pre-existing problem in her neck" but that her "doctor . . . will state that this accident aggravated the condition and accelerated the need for surgery." He noted medical totals as $45,326.99 and that "no lost wages were presented." After noting that there were two policies applicable, with a total of $100,000 in UM coverage, he recommended a settlement range of $65,000 to $85,000 and asked for authority to offer up to the higher amount. Dkt. No. 99-2 at 10.

---

[7] Some portions of the form were apparently completed later as the form also reflects three offers as follows: $65,000 (offered on November 15, 2004); $85,000 (offered on November 19, 2004); and $100,000 (offered on December 2, 2005).

On November 15, 2004, McKinney was given authority to offer up to $75,000 to settle Wilkins' claim. Dkt. No. 95-12 & 99-2 at 22. McKinney called Wilkins' attorney that same day and offered $65,000. He explained that State Farm was offering less than the demand because it believed there was some issue of causation in light of Dr. Santiago's notation that Wilkins' cervical problems were minimal and likely predated the accident. *See* Dkt. No. 95-11 (attorney's responsive letter); Dkt. No. 99-2 at 22 (McKinney notation that he spoke with counsel and offered $65,000 but that counsel continued to demand the policy limits of $100,000 and "would get back with" McKinney).

Counsel immediately responded by letter stating that while Santiago had noted preexisting conditions, he also indicated these problems were aggravated by and became symptomatic because of the accident. Dkt. No. 95-11 (November 15, 2004 letter). Counsel reiterated that Wilkins had incurred "over $47,178.36 in medical bills" (the same amount indicated in the June 2004 letter) and also asserted that Wilkins had "suffered a 20% military disability, been forced to retire from the military on disability, and will have continuing lifelong problems." *Id.* As with prior letters, none of the claims of disability, forced retirement or ongoing problems were supported by documentation.

Based on these assertions, counsel demanded the policy limits (which he now understood to be $100,000) and again threatened to bring a bad faith cause of action under *Nichols* if the policy limits were not tendered within fifteen days. He asserted that the "refusal to tender the policy limits–indeed, to offer barely more than my client's medical bills–is both bad faith and unreasonable action." Dkt. No. 99-2 at 4.

This letter was received on November 17, 2004 by McKinney, who forwarded the letter to his supervisor for review. Dkt. No. 95-12. Two days later, the supervisor made the following notation in State Farm's records: "Reviewed and discussed claim with CR McKinney. I don't

7

believe that a difference of opinion as to the value of a claim would be a bad faith issue, it's simply a difference of opinion. In any respect, contact [attorney] and explain our position and continue negotiations." *Id.*

McKinney's notations for that same date, November 19, 2004, indicate he was given authority up to $100,000 and that he called Wilkins' attorney the same day to discuss the matter. The notations state and it is undisputed that McKinney offered $85,000 in this call , again asserting State Farm's position that causation was an issue due to Wilkins' preexisting problems. Nonetheless, he indicated that State Farm was willing to continue negotiations. Dkt. No. 95-12. Wilkins' attorney reiterated that Wilkins would not accept less than $100,000 and that any offer of less than that amount was bad faith because the claims were "obviously worth more than [the policy] limits." *Id.*

This exchange was the last communication between the parties for over a year. Communications opened again after Wilkins filed suit in state court against the uninsured motorist in November 2005.[8] Counsel forwarded a copy of the suit papers to McKinney by certified mail on November 25, 2005. Dkt. No. 99-2. State Farm was also served with these suit papers (as required by S.C. Code § 38-5-70) through the South Carolina Department of Insurance by letter dated November 29, 2005. Dkt. No. 99-2 at 7.

On December 2, 2005, just a few days after suit was filed against the uninsured motorist and served on State Farm, McKinney communicated an offer of $100,000 to Wilkins' attorney. Counsel

---

[8] McKinney did, however, make several notations in the claim file in the interim as follows: on January 25, 2005 he noted "no changes"; on May 3, 2005, he noted "the ball is in the attorney's court"; on August 5, 20005, he noted "no changes; statute will run Jan 15, 2006." Dkt No. 99-2 at 21.

8

responded that he would probably advise his client not to accept the offer.[9] Wilkins' response came in the form of amendment of the state court complaint to add claims for bad faith against State Farm and McKinney to the suit versus the uninsured motorist.

State Farm removed the action to this court based on diversity jurisdiction and claims of fraudulent joinder of the non-diverse Defendants (the uninsured driver and McKinney). Through a series of subsequent events, the court severed some claims and dismissed others, resulting in a determination that the court could assert jurisdiction over the surviving claims of the removed action which were asserted solely against Defendant State Farm. *See* Dkt. Nos. 27, 28, 47, 63, & 73.[10]

The complaint asserts a single claim for "bad faith and breach of insurance contract" against State Farm. Dkt No. 1-2 at 4. This claim focuses on State Farm's alleged bad faith in failing to make a reasonable investigation and a reasonable and timely offer of settlement. As Wilkins states in answers to interrogatories, her position is that, for State Farm to have made a reasonable offer, "Policy limits of $100,000 should have been tendered on November 30. 2004 based on time limit set in the *Nichols* letter sent to Brent McKinney on November 15, 2004." Dkt. No. 95-13.

## DISCUSSION

**I.     Availability of Bad Faith Claim for Unreasonable Offer to Settle Uninsured Motorist Claim.**

The first question before this court is whether the South Carolina Supreme Court would recognize a claim for bad faith failure to pay uninsured motorists benefits where the allegations relate

---

[9] McKinney states that he was unaware of the suit papers when he called counsel to offer the $100,000. He asserts that he was prompted to make the offer because he knew the statute of limitations was about to run. For purposes of this order, the court draws the reasonable inference that McKinney was aware of the suit and knowledge of the suit triggered the offer.

[10] Because the case was twice reassigned, these orders were entered by three different judges.

9

to actions predating the insured's institution of an action against the uninsured motorist. *See generally Nichols v. State Farm Mut. Auto. Ins. Co.,* 306 S.E.2d 616, 619 (1983) (recognizing bad faith claim in first party insured context). The second question is whether it would do so under the circumstances presented in this case.

The South Carolina Supreme Court has refused to recognize such a claim in at least one context relating to similar benefits provided by underinsured motorist ("UIM") coverage. *See Williams v. Selective Ins. Co. of the Southeast*, 446 S.E.2d 402 (S.C. 1994) (holding that UIM insurer was not liable for bad faith where the insured had failed to pursue an action against the at-fault motorist). Two judges within this district have, nonetheless, predicted that the state court would not outright preclude claims for bad faith based on actions predating the filing of suit against an underinsured motorist. *See Myers v. State Farm Mut. Auto. Ins. Co.,* 950 F. Supp. 148 (D.S.C. 1997) (Judge Blatt addressing UIM claim); *Snyder v. State Farm Mut. Auto. Ins. Co.*, C.A. No. 2:07-433-PMD (D.S.C. Feb. 22, 2008) (Judge Duffy addressing UIM claim; *Halmon v. Am. Int'l Group, Inc., Ins. Co.*, C.A. No. 2:07-1215-PMD (D.S.C. Dec. 5, 2007) (same).

> In *Myers,* the court characterized the holding of *Williams* as
> 
> merely requir[ing] that the insured bring suit against the at-fault driver and serve the suit papers on the insured's underinsured carrier before any suit can be brought by the insured against this carrier; Williams does not address the issue of when the insured may bring a suit against his own carrier for bad faith after bringing suit against the tortfeasor . . . .

*Myers*. at 150. The *Myers* court predicted that the state court would hold that an insurer's duty of good faith to its insured under a UIM policy arises, at the latest, "after the insured brings suit against the at-fault driver and serves the carrier with process." *Myers* at 150. It also suggested in dicta that the duty might arise as early as filing of the action. *Id.* at n. 1. *See also Halmon*, Dkt. No. 11 at 6-11

(explicitly following *Myers'* rule that a UIM insurer's duty of good faith arises when the insured has filed a claim against the at-fault driver and dismissing action as premature); *Snyder,* Dkt No. 38 at 3 (applying rule in case in which insurer took over defense of underinsured motorist but finding, as a matter of law, that there was no bad faith).

In this case, Plaintiff seeks to extend the *Myers* rule in several ways. First, Plaintiff seeks to extend the duty of good faith recognized in *Myers* from UIM cases to UM cases. Because of the similarity of the coverages, the court will assume for present purposes that such an extension would be reasonable (assuming *Myers* and its progeny correctly predicted South Carolina law). Second, Plaintiff seeks to extend the duty to negotiations *predating* institution of litigation against the allegedly at-fault third-party motorist. This extension is more problematic as it was merely suggested as a possibility in *Myers* and seems, in certain respects, contrary to the ruling in *Williams v. Selective Ins. Co. of the Southeast,* 446 S.E.2d 402 (holding UIM insurer was not liable for bad faith where the insured had failed to pursue an action against the at-fault motorist). Nonetheless, for present purposes, the court will assume without deciding that a duty of good faith and fair dealing arises at least upon an insurer's receipt of notice of an insured's claim under a UM policy.[11]

This leads to the critical question of the scope of the insurer's pre-litigation duty of good faith, assuming such a duty exists. As to this duty, Plaintiff seeks to impose a duty on the insurer not merely to engage in settlement negotiations and to make a substantial offer, but to make an offer of the policy limits when liability is not in dispute and the insured has made a reasonable claim that her damages "clearly exceed" the policy limits. This is more than was required in *Myers* and its

---

[11] The court emphasizes that this is a mere assumption for purposes of argument. The court need not ultimately resolve when the duty first arises in light of its determination that no duty was breached in the present case.

11

progeny. *See* Myers, 950 F. Supp. at 151 (holding that "in cases of liability where it is clear that damages have been suffered by the insured that are greatly in excess of the tortfeasors' policy limits, the underinsured carrier may have a duty to make *a settlement offer* prior to its insured obtaining a judgment against, or exhausting the policy limits of, the tortfeasor"–emphasis added); *Snyder*, Dkt. No. 38 at 8 & 10 (noting that "a duty to deal in good faith does not necessarily entail a duty to make a settlement offer" and recognizing that an offer to participate in a summary jury trial with minimum and maximum awards was a form of settlement offer).

This court must, therefore, consider whether, in light of all the circumstances surrounding State Farm's negotiations with Wilkins' and her attorney, State Farm's actions might reasonably be said to amount to bad faith. Those circumstances include the following: (1) prior to any litigation against the uninsured motorist, the insurer made a substantial offer of 85% of the policy limits, which amounted to nearly twice the established medical expenses; (2) while other expenses or losses were claimed, none had been documented; (3) at the time of the insurer's last pre-suit offer, the insurer indicated a willingness to negotiate further; (4) the insurer took no further action to initiate discussions after the insured, through counsel, repeated the initial demand for policy limits during the same conversation in which the 85% offer was made; and (5) the insurer immediately offered the full policy limits once suit was filed against the uninsured motorist roughly one year later.

The court begins by recognizing the unique position an insurer holds with respect to UM and UIM coverage. As to both forms of coverage, the insurer has the legal right to step into the shoes of the allegedly at-fault under or uninsured motorist in defending the litigation. It is only upon conclusion of such litigation that the duty to pay contract benefits clearly arises. *See* S.C. Code Ann. § 38-77-150(a) (requiring uninsured coverage "undertaking to pay the insured all sums which he is

legally entitled to recover as damages from the owner or operator of an uninsured motor vehicle"). Thus, from the institution of litigation to its conclusion, the insurer is, essentially, in an adversarial position to its insured. This distinguishes UM and UIM claims from the type claims at issue in a typical first-party insurance case. *See generally Halmon*, Dkt. No. 11.

At the same time, the duties are distinguishable from those which would be owed if the insurer was, in fact, the insurer of the underinsured or uninsured motorist. In such an event, the insurer would owe no duty of good faith and fair dealing to the injured third-party, but would owe a duty to fully defend its insured and, at least absent the insured's request not to do so, to settle claims within the policy limits if it is possible to do so. *See Tyger River Pine Co. v. Maryland Cas. Co.,* 170 S.E. 346 (S.C. 1933).[12] In this respect, an insurer's duties under a UM or UIM policy may be more like those at issue in a typical first-party insurance case because the insurer is only protecting its own assets and has no duties running to the allegedly at-fault driver.

In short, UM and UIM policies have some characteristics that suggest they should be treated as first-party insurance, and other characteristics that suggest they should, at least during certain stages of the claims process or litigation, be treated as third-party insurance. These characteristics, must be considered in deciding the scope of the duty owed by the UM/UIM insurer to its insured.

As the *Myers* line of cases suggests, the duty of good faith includes, in appropriate cases, a duty to make reasonable efforts to settle the claim through negotiation, at least after suit is filed against the underinsured or uninsured motorist. In the present case, it is undisputed that the insurer

---

[12] While the insured might ultimately assign its rights to seek recovery under the *Tyger River* doctrine to the injured third-party, assuming that third-party obtains a judgment in excess of policy limits, the rights acquired by that assignment would not retroactively impose a duty of good faith and fair dealing running from the insurer to the injured third-party. Instead, it would merely be an assignment of rights owed to the insured.

engaged in settlement negotiations and made two substantial offers before any suit was filed. The first offer was for $65,000 (65% of the policy limits) on November 15, 2004. At this point in time, the adjuster had authority to offer up to $75,000 but made the decision to offer the amount which was on the low end of his valuation of the case.

Wilkins' attorney responded with a letter in which he repeated his demand for the policy limits of $100,000. He repeated that Wilkins' medical expenses "exceeded" $47,178, which was the same amount listed in his June 2004 demand letter. This consistent claim as to the amount of medical expenses, as well as all the medical records and bills provided to the insurer, support its conclusion that Wilkins' active treatment with her surgeon ended in July 2003, with limited follow up through the military until November 2003. There was no evidence of any ongoing treatment, only the attorney's unsupported claims of such treatment and a related but nonspecific disability.

Within days, State Farm responded by increasing its offer to $85,000. This offer was apparently communicated by telephone and rejected in the same conversation through counsel's repeated insistence on policy limits. Although State Farm's adjuster indicated a willingness to continue negotiations, neither side made any further effort at the time. Further, despite counsel's assurance that he would "file suit" against the uninsured motorist if the policy-limit demand was not satisfied by the end of November, he did not file suit for a full year thereafter. When suit was filed, State Farm promptly responded by offering the policy limits.

The picture thus painted is of two sides having reached an impasse at a narrow chasm, the insured having held firm to a demand for policy limits from the outset (albeit having doubled her understanding of what policy limits entailed) and the insurer having started at a moderate figure (claimed medicals plus slightly less than 50%) and moved significantly closer to the insured's

demand with its second offer. The insurer had, moreover, indicated it was willing to move further, with the insured responding only that she did not intend to move at all.

Unfortunately, whether by strategic decision or mere inattention, neither side took any further action for over a year. While the insurer might have encouraged the attorney to submit more proof of long term disability, the attorney might equally well have inquired what more might convince the insurer of the extent of his client's overall injury. It is significant here that the medical claims had not changed at all in five months, and the specific claim of disability (a 20% military disability) had just recently been offered (at least in any written and specific form) and had never been supported by any documentation (either to State Farm or this court).[13]

To the extent it was "unreasonable" to do nothing further, that unreasonableness weighs at least as heavily against Wilkins and her attorney as against the insurer which had left the door open to more negotiations after increasing its offer, over the course of several days, from $65,000 to $85,000. At that point, the insurer was faced with the attorney's claim that, if his demand was not met, he would file suit within fifteen days. Wilkins attorney did not follow through on this promised next step, taking the negotiations from impasse into a void that lasted a full year. At that point, he obtained the desired result simply by doing the very thing he had promised to do a year earlier, filing suit.

The court is not suggesting that counsel acted unreasonably, only that, in light of all the circumstances, it was not unreasonable for the insurer not to take affirmative action to reopen negotiations after having offered 85% of policy limits and having made clear that it was willing to

---

[13] To the extent Wilkins' attorney might have then been relying on case law to support a duty of good faith in negotiations as to a UM claim, that case law (the *Myers* line) would have suggested the advisability, if not the necessity, for filing suit against the uninsured motorist.

15

continue the discussions. This is particularly true given that Wilkins was represented by counsel who had assured State Farm he would institute the legal action against the uninsured motorist if policy limits were not tendered in short order. It is of some significance here that the short deadline given by Wilkins' attorney would have resulted in suit being filed roughly a year before the statute of limitations would have expired.[14]

As the South Carolina Supreme Court explained "[i]f there is a reasonable ground for contesting a claim, there is no bad faith." *Crossley v. State Farm Mut. Auto. Ins. Co.,* 415 S.E.2d 393, 397 (1992). By logical extension, if there is a reasonable ground for offering less than the full amount demanded on a claim, then there is no bad faith in negotiations. Whether an offer is reasonable and made in good faith must be tested based on what was known at the time. *See Snyder*, Dkt. No. 38 at 13 (declining to consider insurer's "erroneous (and costly) miscalculation at to how much money a jury was likely to award"). It must also consider the very nature of negotiations. As explained in the summary judgment order in *Snyder*,

> [s]ettlement negotiations are best served by as much flexibility as possible so long as the parties are negotiating in good faith, as this allows both parties to make proposals which are best suited to serve their particular needs. Artificial constraints or requirements placed upon the options available to the bargaining parties would generally only serve to frustrate attempts to reach a mutually agreeable settlement.

*Id.* at 10-11. *See also Snyder*, Dkt. No. 38 at 8 (noting that "a duty to deal in good faith does not necessarily entail a duty to make a settlement offer").

---

[14] State Farm's decision not to unilaterally reopen negotiations did not, therefore, place Wilkins at risk of losing her right to recover under the policy because of her delay in filing suit against the uninsured motorist. Even had the delay had this effect, it is far from clear that it would have breached any duty owed by State Farm so long as it did not mislead Wilkins or her attorney as to the applicable deadline or its intent to rely on the same.

The offers made in this case were not insignificant. The first offer amounted to 140% of all claimed medicals and the second to 180% of medicals. The insurer did not act unreasonably by disregarding any claimed disability or alleged continuing treatment in its settlement offers given the represented insured's failure to offer any evidence of these claims.[15] Further, while not necessarily a strong argument, State Farm had at least a reasonable basis for raising questions as to causation. disability due to the accident. Under these circumstances, there was room to debate the value of Wilkins' claims. Given this leeway, and in light of the substantial offers made and State Farm's expressed willingness to continue negotiations, the court finds as a matter of law that State Farm did not act in bad faith in failing to offer policy limits prior to Wilkins' institution of suit against the uninsured motorist.[16]

## II.   Breach of Contract Claim

The remaining aspects of Wilkins' breach of contract claim must be dismissed as premature. *See Halmon*. Given the ruling above, a jury could not reasonably find that State Farm breached the contract by offering less than policy limits prior to institution of the action against the uninsured

---

[15] From what was before State Farm, it might reasonably have concluded that Wilkins left the military by choice, not because of any disability. This is both because of her attorney's failure to offer *any* support for the claimed disability and indications in the record that Wilkins may have intended to leave the military even before the accident and may have been even more motivated to do so after the accident due to the death of her husband which left her with sole responsibility for two small children. *See* supra n. 1 (discussing Dr. Santiago's initial report indicating that Wilkins intended to leave the military prior to her accident but had been forced to remain due to a stop loss then in place); Dkt. No. 99-2 at 3 (counsel's letter describing Wilkins as a "young widow with two small children").

[16] For reasons discussed in *Snyder*, the court finds that S.C. Code § 38-59-20 does not establish a standard relevant to this action. Even were the court to consider this code section as providing a standard by which to measure State Farm's actions, it would find the evidence insufficient to raise a jury question as to whether the statutory "standards" were violated because there is no evidence of a common and repeated practice by State Farm.

17

motorist. Because State Farm did offer policy limits once suit was filed, a jury also could not find that it breached the contract by making that offer. State Farm's duty to make payment is, therefore, now dependent either on a new demand for up to policy limits or conclusion of the underlying case against the uninsured motorist. As neither such event has occurred, the breach of contract claim is premature to the extent the claim survives summary judgment.

## CONCLUSION

For the reasons set forth above, the court GRANTS Defendant's motion for summary judgment as to Plaintiff's claims for bad faith failure to pay benefits and for breach of contract based on State Farm's presuit actions. This ruling is without prejudice to a future claim for bad faith or breach of contract based on actions post-dating this decision.

IT IS SO ORDERED.

S/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
July 1, 2008